In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00204-CR


______________________________




CHARLIE CANIDA, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 6th Judicial District Court


Lamar County, Texas


Trial Court No. 20150




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 Charlie Canida appeals from his conviction for possession of methamphetamine, between
four and 200 grams. He was sentenced to twelve years' imprisonment. It appears that he was
convicted not as a principal, but as a party criminally responsible for the criminal act. The
methamphetamine was not directly in Canida's possession, but was found by police officers when
they searched the "Fish Camp." On appeal, Canida contends that the evidence is neither legally nor
factually sufficient to support the verdict. The entire argument is based on the remarkably tenuous
rights to possession and proof of actual possession of the travel trailer in which the cup containing
methamphetamine was found. Despite testimony about manufacture of methamphetamine, which
will appear at length hereafter, this prosecution was for possession of a quantity found in a jar in a
jointly used wooden building within the camp.

 The "Fish Camp" is a tale unto itself. It appears that, some years ago, some people had 
"bought" the right to use a piece of property which legally belonged either to a railroad or to the State
of Texas and moved three travel trailers onto the property (which also had a boat ramp)--all adjacent
to the Red River. (1) The Fish Camp was used in what would be something of a combination of private
and communal use; in addition to the travel trailers (which were used solely by the owners), there
was a wooden building and a steel building which were used by everyone for storage. The charges
for electricity were billed to Maddox, who collected from the others for their shares of the cost. A
few years before the incident giving rise to Canida's arrest, Maddox contracted cancer and sold
Canida his rights to the property; Canida moved a travel trailer which his wife had purchased onto
the property. Canida had the billing for the electrical service transferred to his name.

 The State presented evidence that a small amount of methamphetamine was found in
Canida's trailer and that cooking apparatus and various chemicals used in the cooking process were
found in other buildings throughout the camp. (2) The evidence shows that 1.27 grams of
methamphetamine were found in a baggie in a Texaco coffee cup marked with the name of Leon
Jackson in a travel trailer which Canida's wife owned--and in which Jackson was staying with
Canida's permission. In that trailer, police also found some items used in cooking
methamphetamine: liquid fire (a drain cleaner), MSM powder, and sulfuric acid. In addition, the
evidence shows that Canida paid for electricity to the trailer and that electricity to the camp was in
his name, but the evidence also clearly shows that the camp was used by a number of other
individuals. 

 In the jointly used wooden building, officers found a quart jar containing 82.51 grams of
liquid methamphetamine. In that building, officers also found several items that can be used in the
manufacture of methamphetamine and the officers testified that it was being used for one of the
washes necessary to formulate the drug. (3)

 The remaining ingredients for the manufacture were found in the metal storage building and
the remaining washes were set up for operation in that building. No contraband was found in the
other two trailers. 

 Outside the buildings, however, the evidence shows that there was a trash dump and burn
barrel. The State places considerable weight on the evidence that the trash included bags containing
a number of emptied blister packs labeled as having contained decongestants, several cans of starting
fluid, and several bottles of isopropyl alcohol (all of which can be used in the manufacture of
methamphetamine), as well as the typical detritus of a campsite.

 The evidence does not clearly show the amount of time that Canida spent at the camp,
although one officer testified that he had seen Canida there four to six times during the previous year. 

 On this occasion, officers saw Canida drive up near the Fish Camp in his pickup truck while
they were searching the camp. Canida drove away; an officer followed Canida and stopped him for
a traffic violation. The officer searched his vehicle with consent, and found a small amount of
methamphetamine. (The appeal from his conviction for possession, which was a state-jail felony,
is also before this Court in cause number 06-06-00205-CR.)

 The jury was charged that it could convict Canida either as the actor or as one criminally
responsible for the actions of another. We first address the sufficiency of the evidence to support
his conviction as the actor, and will then turn to sufficiency to convict as a party.

 We have set out the general facts as they may directly relate to Canida's personal commission
of the named offense. In reviewing the legal sufficiency of the evidence, we view the relevant
evidence in the light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In a factual sufficiency review, we view all the evidence
in a neutral light and determine whether the evidence supporting the verdict is so weak that the jury's
verdict is clearly wrong and manifestly unjust or whether the great weight and preponderance of the
evidence is contrary to the verdict. Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006);
see also Johnson, 23 S.W.3d at 7; Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996).

 When an accused is not in exclusive possession of the place where contraband is found, it
cannot be concluded he had knowledge or control over the contraband unless there are additional
independent facts and circumstances which link him to the contraband. Poindexter v. State, 153
S.W.3d 402 (Tex. Crim. App. 2005); (4) Brown v. State, 911 S.W.2d 744, 748 (Tex. Crim. App. 1995);
Menchaca v. State, 901 S.W.2d 640, 651 (Tex. App.--El Paso 1995, pet. ref'd). However, the links
must establish, to the requisite level of confidence, that the accused's connection with the drug was
more than just fortuitous. Brown, 911 S.W.2d at 747. Control over the contraband need not be
exclusive, but can be jointly exercised by more than one person. McGoldrick v. State, 682 S.W.2d
573, 578 (Tex. Crim. App. 1985). To establish guilt, the State must prove both that the accused had
control over the contraband and that the accused had knowledge of its existence and character. 
Brown v. State, 911 S.W.2d 744, 747-48 (Tex. Crim. App. 1995); Menchaca, 901 S.W.2d at 651. 
There is no set formula of facts that dictate a finding of links sufficient to support an inference of
knowing possession of contraband. Porter v. State, 873 S.W.2d 729, 732 (Tex. App.--Dallas 1994,
pet. ref'd). 

 Recognized factors include whether: (1) the contraband was in plain view or recovered from
an enclosed place; (2) the accused was the owner of the premises or the place where the contraband
was found; (3) the accused was found with a large amount of cash; (4) the contraband was
conveniently accessible to the accused; (5) the contraband was found in close proximity to the
accused; (6) a strong residual odor of the contraband was present; (7) the accused possessed other
contraband when arrested; (8) paraphernalia to use the contraband was in view, or found on the
accused; (9) the physical condition of the accused indicated recent consumption of the contraband
in question; (10) conduct by the accused indicated a consciousness of guilt; (11) the accused
attempted to flee; (12) the accused made furtive gestures; (13) the accused had a special connection
to the contraband; (14) the occupants of the premises gave conflicting statements about relevant
matters; (15) the accused made incriminating statements connecting himself to the contraband;
(16) the quantity of the contraband; and (17) the accused was observed in a suspicious area under
suspicious circumstances. Lassaint v. State, 79 S.W.3d 736, 740-41 (Tex. App.--Corpus Christi
2002, no pet.); Kyte v. State, 944 S.W.2d 29, 31-32 (Tex. App.--Texarkana 1997, no pet.). 

 There is no requisite number of links. Rather, it is the logical force the factors have in
establishing the elements of the offense that is important. In other words, is there evidence of
circumstances, in addition to mere presence, that adequately justifies the conclusion that the
defendant knowingly possessed the substance. Evans, 202 S.W.3d at 162 n.9. See generally King
v. State, 895 S.W.2d 701 (Tex. Crim. App. 1995); Gilbert v. State, 874 S.W.2d 290, 298 (Tex.
App.--Houston [1st Dist.] 1994, pet. ref'd).

 We have summarized the evidence above. Canida was neither on site, nor was there proof
that he was there regularly, although Officer Moore testified that he had seen Canida there four to
six times over a year or so. The evidence suggesting that Canida was there regularly was a
prescription pill bottle found in the trailer containing Canida's heart medication; he takes it daily, so
there is at least an indication that he was there often enough for it to be convenient to have the
medication available on site. (5) 

 Thompson, who owned one of the other trailers (and who was not prosecuted), testified that
the electricity had been transferred into Canida's name about a year and a half earlier because the
prior payor, Maddox, was dying of cancer. At the same time, Maddox sold his trailer to Farmer. 
Thompson testified that they all split the cost of the electricity.

 Vicki Bryant testified that Jackson (her boyfriend's nephew) had lived with them for a time
and that she made him move out because he had stolen a pistol (which was found at the camp). She
also testified that Jackson went there to hide out from them (her) and that Canida liked to "hang out"
at the camp and was there on a regular basis.

 Louise Canida, the appellant's wife, testified that on the day that her husband was arrested,
she was having knee replacement surgery and that she told him to go on and do what he needed to
do as she recovered. She testified that she knew Canida had allowed Jackson to stay in their trailer;
she indicated that she did not approve and had evidently voiced her objections about this to Canida. 
She also testified that Canida took Procardia for his heart and kept some of it at the trailer so if he
stayed overnight he would have the medication the next morning. 

 The question is whether the evidence is sufficient to either prove that Canida committed an
offense by personally possessing methamphetamine or to prove that he was criminally responsible
for the possession of the methamphetamine by another person.

 The contraband was not in plain view; it was inside a building to which Canida could have
obtained entrance, although there is no evidence that he did so at any recent time. Canida was not
technically an owner of the realty on which the buildings stood but was in some abstruse fashion a
joint possessor of the land and the building itself. This link does support conviction, albeit weakly.
No cash was found. The contraband was accessible--but the cases discussing that factor do not
typically involve access to a different building, but more often discuss whether the contraband was
stuffed into a couch where the defendant was sitting or some similar situation where the contraband
was within arm's length. It was certainly not conveniently accessible from the pickup truck in which 
Canida was first spotted by law enforcement officers. 

 Officers testified that the recognizable odor of a methamphetamine laboratory was present
at the Fish Camp, but not from the place Canida was spotted or arrested. Paraphernalia for cooking
the methamphetamine was nearby and in reasonably plain view; however, they were in view at the
Fish Camp and its environs, but not from Canida's pickup truck. Although Canida was found with
a quantity of less than a gram of methamphetamine in his truck, there was no evidence of recent use
of it by him. Canida's conduct did indicate at the least awareness of a problem: when he arrived at
the Fish Camp and saw people at the camp other than those he knew, he drove away from the Fish
Camp rather than continuing toward it. He did not thereafter attempt to evade or flee from the
officer following him and no "furtive gestures" were involved, but his initial act of attempting to
avoid the officers he saw at the Fish Camp does favor the position of the State. 

 No inculpatory statements were involved and the quantity of contraband, while considerable,
was not so large as to make Canida's knowledge of its existence unavoidable. There was testimony
that the general area was one rife with criminal activity, even though it was merely a "fish camp." 
Canida was observed entering and, upon seeing strangers, attempting to leave a suspicious area; the
circumstances of his entry and exit are, indeed, somewhat suspicious, because the evidence revealed
that a methamphetamine cook was in progress at the time that he arrived.

 Although the State staunchly attempts to defend the conviction against Canida as the actor,
its arguments are more directed at defending the conviction under party liability theories of law. As
an actual possessor of the property, we must agree with Canida's counsel so far as sufficiency of the
evidence to show personal possession. The contraband was not found in Canida's residence (if we
consider the trailer as such); although there is some proof that he was at the Fish Camp from time
to time, what the evidence actually shows is that two other people were at the camp cooking
methamphetamine and that one of those people had been allowed by Canida to stay in his trailer. 
Although there is evidence that Canida was coming into the Fish Camp area, there is neither any
proof that he knew about the methamphetamine cooking operations which were taking place nor any
evidence that he had been there at a previous point which would show that he had any knowledge
of the methamphetamine cooking that was then occurring. It is, however, conceivably possible to
infer that Canida knew methamphetamine was cooking there because he had a small quantity with
him. 

 There is evidence that a much smaller amount of methamphetamine was found in Canida's
wife's trailer--in which there was no evidence Canida had recently stayed--and in which someone
else was then living, and in a cup emblazoned with that person's name. This may provide a link, but
again, it is a very tenuous one.

 There was also evidence about the quantity and type of trash found in the immediate area. 
The State argues that Canida must necessarily have known that methamphetamine was being
manufactured because, due to the nature of the operation of a methamphetamine laboratory and the
quantity of the trash containers from drug-making operations which had taken place, it was
unavoidable to notice. That assumes three things: (1) that Canida knew the import of that type of
trash; (2) that he had previously rifled through trash bags and the burn barrel to see what was in them
in order to even know what the trash barrel contained, and (3) that he had been in the camp recently
enough to do so. If that line of assumptions favors the State at all, the inference is extremely weak. 

 Based on this evidence, and the inferences to be drawn from them, although there is some
evidence to support conviction as a principal, we must find that the evidence is factually insufficient
to allow a conclusion that Canida personally possessed the contraband at bar. 

 The further question is whether the evidence would support a jury's finding that Canida was
guilty as being criminally responsible for the acts of Jackson or Johns.

 Section 7.01 of the Texas Penal Code provides that a person is criminally responsible as a
party if the offense is committed by his own conduct, or by that of another for which he is criminally
responsible. Tex. Penal Code Ann. § 7.01 (Vernon 2003). Section 7.02 states that a defendant is
criminally responsible for an offense committed by the conduct of another if, acting with intent to
assist in the commission of the offense, he "solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense." Tex. Penal Code Ann. § 7.02 (Vernon 2003). In determining
whether an accused bears criminal responsibility for an offense, we may look to events before,
during, and after the commission of the offense. Marable v. State, 85 S.W.3d 287, 293 (Tex. Crim.
App. 2002). Furthermore, a person can be convicted as a party even if (as in this case) the
indictment does not explicitly charge him as a party. Powell v. State, 194 S.W.3d 503, 506 (Tex.
Crim. App. 2006).

 The State provided strong evidence that Johns and Jackson were involved in a
methamphetamine cooking operation. The result of the cooking operation was their possession of
the methamphetamine so produced. Thus, if the evidence proves that Canida intentionally solicited,
encouraged, directed, aided, or attempted to aid them in the manufacturing process, it necessarily
proves a connection with the finished product as well.

 There is evidence that Jackson was both in possession of methamphetamine and that would
readily support a conclusion that he was assisting with the manufacture. The evidence shows that
Canida gave Jackson permission to stay in his trailer at the camp. There is some evidence that
Canida had been (during the prior year) at the camp four to six times, and some evidence that he was
there regularly, although that evidence is entirely imprecise. There was evidence that Canida was
coming to the camp (with methamphetamine in his possession) and that, when he saw officers there,
he slowed down and then turned to leave, in what could be construed as an attempt to avoid an
encounter with the police. In the absence of any knowledge of illegal activity at the camp, Canida
would have less of a reason to avoid police--although that argument is strained because, even if he
had no knowledge of illegal acts at the camp, he was at that time in possession of a small amount
of methamphetamine. The fact that the contraband he had in his possession was the same type of
drug as was being manufactured at the camp allows some inference that he was going to the camp
to protect his interest in the product being created, but we are also aware that methamphetamine is
currently rampant and is not so unique or unusual as to allow any conclusive presumptions to be
drawn from Canida's possession of the small amount in his truck.

 For Canida to have permitted this miscreant to live in his trailer shows bad judgment, but
does not necessarily make him a party to possession of the miscreant's drugs. For Canida to turn and
try to avoid police might show knowledge of what the miscreant was doing, but is equally
understandable for other reasons, since Canida had an illegal drug in his truck at the time. In the
absence of any evidence that Canida was at the camp during any relevant time frame when he might
have acquired knowledge of the manufacture, presumptions of knowledge from any apparent
cooking process cannot be drawn. The wooden building was secured by a lock, and there is evidence
that only Thompson and Canida had a key to the building and that Thompson had not given his key
to anyone else. Nevertheless, the building was open, and Jackson and Johns were using that building
for part of the wash process used in the manufacturing process.

 This evidence, when reviewed in the light most favorable to the verdict, can be said to
support a conclusion that Canida was aware of the activity, and that he was supporting its conduct
by allowing one of the actors to stay there and conduct the criminal activity in an area that Canida
claimed to possess. Thus, the evidence is legally sufficient to support the verdict.

 In a factual sufficiency review, we view all the evidence in a neutral light and determine
whether the evidence supporting the verdict is so weak that the jury's verdict is clearly wrong and
manifestly unjust or whether the great weight and preponderance of the evidence is contrary to the
verdict. See Watson, 204 S.W.3d at 417. This evidence is weak.

 Summarized, the evidence which favors conviction shows that:

 (a) law enforcement officers arrived at the Fish Camp in time to catch Jackson and Johns
involved in a methamphetamine cooking operation;

 (b) Canida and his wife owned the camper trailer in which Jackson was staying and there
were prescription drugs for a heart condition labeled for Jackson in the trailer;

 (c) Canida had been seen in the area by a law enforcement officer four to six times in the
previous year;

 (d) the account for the provision of electrical service to the entire Fish Camp was held
in Canida's name;

 (e) the general premises of the Fish Camp were littered with the kinds of trash and
paraphernalia which are common to the manufacture and use of methamphetamine;

 (f) when Canida arrived near the area of the Fish Camp and detected the presence of
strangers there, he diverted his course and went away; and

 (g) when Canida was stopped by an officer for not wearing his seat belt, there was a small
amount of methamphetamine in the truck he was driving (the possession of which he has been
separately charged).

 The evidence contravening those things is as follows:

 (a) there was no evidence that Canida was actually aware that methamphetamine was
being manufactured or stored at the Fish Camp;

 (b) another person was actually residing in Canida's camper trailer at the time;

 (c) although the electrical service contract was held in Canida's name, it was a matter of
convenience because two other people equally shared the cost of provision of this utility;

 (d) even though Canida had joint use of the metal and wooden buildings on the property
and the property itself, he did not have exclusive control of them;

 (e) because Canida had methamphetamine in his truck, which he would probably not
want anyone to discover, he had good reason to avoid peace officers who were at the Fish Camp;

 (f) except for the evidence that Canida had been seen around the Fish Camp area four
or five times in the last year, there was nothing to show that Canida was around at any time when
the methamphetamine-cooking operation was taking place or that he was aware that it was occurring;
and

 (g) there is nothing to show that Canida had any reason or occasion to check the area
around the burn barrel to examine its contents and, even if he had examined its contents, to know
the significance of the trash contained.

 In summation, although the State can tie Canida to the trailer (as its owner), to the Fish Camp
and its environs (as one of its co-possessors), and to Jackson (as Jackson's landlord), there is
factually insufficient evidence to connect Canida to the methamphetamine for which he has been
charged in this case.

 We reverse the judgment and remand the case to the trial court for further proceedings.



 Bailey C. Moseley

 Justice


Date Submitted: March 20, 2007

Date Decided: April 3, 2007


Do Not Publish

1. These belonged to Ken Maddox, Gary Thompson, and Woody Farmer. 
2. The officers chased Leon Jackson into one of the buildings and captured both Jackson and
Curtis Johns on the premises. The officers testified that they immediately recognized that the
location was being used to cook methamphetamine, immediately obtained a search warrant, and then
searched the other buildings.
3. Specifically, officers found Drainout, ether, acetone, coffee filters, ephedrine powder, and
starting fluid.
4. The Texas Court of Criminal Appeals recently wrote in Evans v. State, 202 S.W.3d 158, 162
(Tex. Crim. App. 2006), that these should be called "links" rather than "affirmative links" hereafter,
as using the modifier "affirmative" adds to much confusion within the context of a factual sufficiency
review.
5. As a sidenote, the officer who stopped Canida's pickup truck did so based on a seat belt
violation, and truthfully acknowledged that he could have arrested Canida for that traffic violation,
and would probably have done so instead of giving him a citation--and would of course then have
been forced to inventory the vehicle before it was towed.


60;   If a claimant furnishes a report within the time permitted, a defendant may file a motion
challenging the report. See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l) (repealed 2003). The
trial court shall grant the motion only if it appears to the court, after hearing, that the report does not
represent a good-faith effort to comply with the statutory definition of an expert report. See Tex.
Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l); Palacios, 46 S.W.3d 877–78. In determining whether
the report represents a good-faith effort, the trial court's inquiry is limited to the four corners of the
report. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6); Palacios, 46 S.W.3d at 878.
            Although the trial court stated as its reason for dismissing the lawsuit the failure to meet "the
25 day extension,"


 the order granting the dismissal did not specify a reason. A trial court cannot
abuse its discretion if it reaches the right result, even for the wrong reason. See In re Acevedo, 956
S.W.2d 770, 775 (Tex. App.—San Antonio 1997, no pet.); Hawthorne v. Guenther, 917 S.W.2d 924,
931 (Tex. App.—Beaumont 1996, writ denied); Luxenberg v. Marshall, 835 S.W.2d 136, 141–42
(Tex. App.—Dallas 1992, no writ). Therefore, we must consider whether the suit should have been
dismissed under the Appellees' alternative argument that the expert report was inadequate.
            Omission of any of the statutory elements prevents the report from being a good-faith effort. 
Palacios, 46 S.W.3d at 879. A report that merely states the expert's conclusions about the standard
of care, breach, and causation does not meet the statutory requirements. Id. These three separate
requirements must all be present and described with sufficient specificity.
            The expert report must set forth an applicable standard of care. Tex. Rev. Civ. Stat. Ann.
art. 4590i, § 13.01(r)(6). The standard of care for a physician is what an ordinarily prudent physician
would do under the same or similar circumstances. Palacios, 46 S.W.3d at 880. Identifying the
standard of care is critical: "[w]hether a defendant breached his . . . duty to a patient cannot be
determined absent specific information about what the defendant should have done differently." Id. 
"While a 'fair summary' is something less than a full statement of the applicable standard of care and
how it was breached, a fair summary must set out what care was expected, but not given." Id. In
other words, the report must specify what the defendant should have done.
            Second, the expert report must indicate how the defendant breached the standard of care. The
report must indicate what actions taken by the defendant deviated from the standard of care. It must
be a "fair summary" of the care which was expected, but not given. Id.
            The expert's report must also contain information on causation. It is not enough for a report
to contain conclusory insights about the plaintiff's claims. Bowie Mem'l Hosp. v. Wright, 79 S.W.3d
48, 52 (Tex. 2002); Sutherland, 107 S.W.3d at 790. Rather, the expert must explain the bases of the
statements and link his or her conclusions to the facts. Id.
            Russ presented an expert report in letter form from Mitchell H. Dunn, M.D. The report, in
its entirety, states as follows:
It is my opinion, held to a reasonable degree of medical probability, that there were
several deviations from the standard of care that directly contributed to the injuries
sustained by Robin Russ on the evening of December 3, 1999. 
 
Dr. Quiring deviated from the standard of care by failing to fully evaluate Ms. Russ'
suicidal ideation and plans, and failing to inquire about the reason for her excessive
serum Dilantin level. There is no evidence that he ever performed a mental status
examination. It is evident that he believed the overdose was purposeful as his
progress note read "Attention getting ? vs. suicidal attempts." Also, it is clear that
Ms. Russ was being held in the hospital awaiting transfer to a psychiatric hospital,
indicating that she required further care in a psychiatric hospital setting. Dr. Quiring
was aware of this and should have been aware of the MHMR representative's concern
that "client may try suicide again." He further deviated from the standard of care by
failing to order one-to-one observation of Ms. Russ. Her numerous episodes of
attempting to get out of bed unsupervised, her very unsteady gait, and her history of
impulsive, potentially life-threatening behaviors necessitated either one-to-one
observation or restraints that were escape-proof. Either one of these interventions
would have prevented Ms. Russ' injuries.
 
The hospital deviated from the standard of care by placing a patient with potential
suicidal ideation and recent suicidal behavior in a fourth floor room with unlocked
windows. It is the standard of care that windows either be secured with metal screens
that only staff can open, or be locked. If the patient has access to the window, a
special difficult to break glass or Plexiglass should be used. It is simply unacceptable
that patients of that type could have access to an open window. Obviously, if there
was no access to an open window, Ms. Russ' injuries would not have occurred.
 
The nursing staff at Titus Regional Medical Center also deviated from the standard
of care by failing to pass on critical information regarding Ms. Russ' ICU behavior,
including the fact that her dilantin toxicity was purposeful, her degree of agitation,
her multiple attempts to get out of bed unsupervised, and her need for one-to-one
supervision. Then, even after witnessing her agitation, her unsteady gait, and the fact
that "Patient almost went over other side of bed head first," the nurses on the med.-surg. floor failed to restrain Ms. Russ or pursue a higher degree of supervision for
her. If they had, Ms. Russ' injuries would not have occurred. In addition, the nurses'
notes reflect knowledge that Ms. Russ had cigarettes but would not give them up
when the staff requested that she do so. If they had obtained a doctor's order to
confiscate Ms. Russ' cigarettes, perhaps she would not have tried to go out on the
ledge. 
            The plaintiff must only make a good-faith attempt to provide a fair summary of the expert's
opinions in the expert report. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l); Palacios, 46 S.W.3d
at 875. A "good-faith" effort requires that the report discuss the standard of care, breach, and
causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called
into question and to provide a basis for the trial court to conclude that the claims have merit. 
Palacios, 46 S.W.3d at 875. "[T]o avoid dismissal, a plaintiff need not present evidence in the report
as if it were actually litigating the merits. The report can be informal in that the information in the
report does not have to meet the same requirements as the evidence offered in a summary-judgment
proceeding or at trial." Id. at 879. The expert report is not required to prove the defendant's liability,
but rather only provide notice of what conduct forms the bases of the plaintiff's complaints. "To
constitute a 'good-faith effort,' the report must provide enough information to fulfill two purposes: 
(1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2)
it must provide a basis for the trial court to conclude that the claims have merit." Wright, 79 S.W.3d
at 52 (citing Palacios, 46 S.W.3d at 879).
            Palacios makes it clear that a claimant must present specific evidence in a medical report
because "knowing what specific conduct the plaintiff's experts have called into question is critical
to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability
of the plaintiff's claims." Palacios, 46 S.W.3d at 877. The Texas Supreme Court stated that
"[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific
information about what the defendant should have done differently." Id. at 880. In other words, one
must be able to determine from the report what the standard of care required to be done. This
requires "specific information about what the defendant should have done differently." Id. 
However, the report is not required to use magical words. Wright, 79 S.W.3d at 53; Sutherland, 107
S.W.3d at 790. It is the substance of the opinions, not the technical words used, that constitutes
compliance with the statute. Sutherland, 107 S.W.3d at 790. 
            Dr. Dunn's report states his opinions concerning the standard of care, the breach, and
causation relating to the Hospital in these particulars:
Standard of Care:
It is the standard of care that windows either be secured with metal screens that only
staff can open, or be locked. If the patient has access to the window, a special
difficult to break glass or Plexiglass should be used. 

Breach:
The hospital deviated from the standard of care by placing a patient with potential
suicidal ideation and recent suicidal behavior in a fourth floor room with unlocked
windows. 

Causation:
Obviously, if there was no access to an open window, Ms. Russ' injuries would not
have occurred.

            The expert report clearly provides the standard of care for the Hospital. It provides that the
standard of care is that the window should have been locked or secured with metal screens. This is
a specific allegation which provides the Hospital with notice of the conduct complained of by Russ. 
The report then provides that the standard of care was breached by placing a suicidal patient in a
fourth floor room with unlocked windows. Again, this statement is specific and informs the Hospital
of the conduct of which Russ is complaining. Last, the report states that, if Russ did not have access
to an open window, her injuries would not have occurred. It is undisputed that Russ' injuries resulted
from falling out of a fourth story window. Obviously, a party cannot fall from a window if one
cannot exit through the window. The substance of the report gives fair notice to the Hospital of the
negligent conduct on which Russ relies and provides a sufficient basis for the trial court to conclude
that the claims have merit. 
            Dr. Dunn's report states his opinions concerning the standard of care, the breach, and
causation relating to Dr. Quiring in these particulars:
Standard of Care:
Her numerous episodes of attempting to get out of bed unsupervised, her very
unsteady gait, and her history of impulsive, potentially life-threatening behaviors
necessitated either one-to-one observation or restraints that were escape-proof. 

Breach:
He further deviated from the standard of care by failing to order one-to-one
observation of Ms. Russ. 

Causation:
Either one of these interventions [one-to-one observation or escape proof restraints]
would have prevented Ms. Russ' injuries.

            In contrast to the report in Palacios, the expert report here provides the Appellees and the
trial court with the specific information required. This report states that "[h]er numerous episodes
of attempting to get out of bed unsupervised, her very unsteady gait, and her history of impulsive,
potentially life-threatening behaviors necessitated either one-to-one observation or restraints that
were escape-proof." (Emphasis added.) The term "necessitated" connotes that the actions which
follow should have been done and were essential or vital. The expert stated that either one-to-one
observation or escape restraints were necessary. It is clear from the report what the expert believes
the physician should have done. Based on this information, the physician knew precisely the
complained-of failures. Further, the trial court had information on which to evaluate the viability
of Russ' claims. When discussing the actions of the physician , and his care to the patient, stating
that a course of treatment is "necessitated" establishes the standard of care and complies with the
requirements for a medical report.
            Last, our analysis arrives at the conduct of the two remaining nurses, Peggy Burge, R.N., and
Rachel Meyers, R.N. The expert report explains in detail the omissions of the nurses which he
regarded as a breach of the standard of care. However, the report does not state what conduct was
necessary or required and, therefore, gives no assistance to the trial court in attempting to evaluate
the conduct of the nurses by the standard of care governing them. A trial court does not abuse its
discretion in dismissing a suit in which one is required to infer the standard of care from the
allegations in the expert report. Wright, 79 S.W.3d at 53. Thus, the trial court did not abuse its
discretion in dismissing the suit as to the nurses because the standard of care must be inferred.
            The report is a good-faith attempt to give a fair summary of the standard of care, the breach,
and the cause of the injuries suffered as a result of that breach concerning the Hospital and
Dr. Quiring. Because the report in this case is not conclusory and does not require inferences, the
report adequately fulfills the requirements of the statute as it relates to the Hospital and Dr. Quiring.
            Last, the Hospital argues in the alternative that the report is inadequate because Dr. Dunn is
not a qualified expert and that he did not state whether his standard of care applies to a general
hospital. We will briefly address these remaining arguments. 
            The Hospital contends the expert is not qualified because he has never worked in a general
hospital. We disagree. Dr. Dunn meets the definition of an "expert" for the purpose of Section
13.01(r)(5)(A). Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(5)(A) (repealed 2003); see Tex.
Rev. Civ. Stat. Ann. art. 4590i, § 14.01(a), Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 2, 1995
Tex. Gen. Laws 988, repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex.
Gen. Laws 884. Dr. Dunn is a board certified psychiatrist who has served as acting clinical director
and medical director of the forensic program of Terrell State Hospital since 1995.
            The Hospital also argues that the expert report fails to specify whether this standard of care
applies to a general hospital or simply to a psychiatric hospital. It is apparent that Dr. Dunn knew
the Hospital was a general hospital because he stated Russ was awaiting transfer to a psychiatric 
hospital. "The standard of care for a hospital is what an ordinarily prudent hospital would do under
the same or similar circumstances." Palacios, 46 S.W.3d at 880. In addition to serving as the
medical director of the forensic program at Terrell State Hospital, Dr. Dunn also has a part-time
practice in adult and forensic psychiatry. He has treated many patients with suicidal behavior and
has had the responsibility to make decisions to prevent suicidal behavior. We have found that he has
expressed the proper standard of medical and hospital care. He has training and experience to allow
him to offer such opinions. The requirement of an expert report is to inform the opposing party of
Russ' claim and to provide the trial court with a basis to conclude that the claim has merit. The
report is not required to litigate the claim. Id. at 879. We find Dr. Dunn qualified to render such a
medical report.
            We have carefully examined the Texas Supreme Court's decisions in Palacios and Wright,
and believe that this case is distinguishable. Unlike the reports examined in Palacios, the report in
question is not conclusory as it pertains to Dr. Quiring and the Hospital. The report contains specific
information which informs the Appellees what Russ is contending they should have done. Further,
one is not required to infer a standard of care from mere insights provided by the report. Further,
Palacio's two-part test to determine "good faith" was met concerning Dr. Quiring and the Hospital. 
Therefore, the trial court had no discretion to conclude that the report as it pertains to Dr. Quiring
and the Hospital was not a good-faith effort. 
            Accordingly, we affirm the judgment of the trial court concerning Peggy Burge, R.N., and
Rachel Meyers, R.N.; we reverse the judgment of the trial court concerning Dr. Quiring and the
Hospital, and remand the case to the trial court for further proceedings.
 


                                                                        Jack Carter
                                                                        Justice

Date Submitted:          January 22, 2004
Date Decided:             February 3, 2004